UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
PSG POKER, LLC, and PHIL GORDON,        :
                      Plaintiffs,       :
                                        :        06 Civ. 1104 (DLC)
                                        :
          -v-                           :        OPINION & ORDER
                                        :
                                        :
TONY DeROSA-GRUND, PROJO POKER          :
TOURNAMENT SERIES, LLC., PROJO POKER    :
TOURNAMENT SERVICES, LLC., and PROJO    :
POKER TOURNAMENT SERVIES, LLC.,         :
                      Defendants.       :
                                        :
----------------------------------------X

Appearances

For Plaintiffs:
Jonathan J. Ross
Caplan & Ross, L.L.P.
100 Park Avenue, 18th Floor
New York, NY, 10017

For Defendant Tony DeRosa-Grund:
Pro Se
600 Pocono Boulevard
Mt. Pocono, PA 18344


DENISE COTE, District Judge:

     Plaintiffs PSG Poker, LLC ("PSG Poker") and its principal

member Phil Gordon ("Gordon") bring this suit against the

defendants for breach of contract and fraudulent inducement in

connection with a contract for the production of a poker

television program.  On December 4, 2006, following the

withdrawal of counsel for the individual defendant Tony DeRosa-

Grund ("DeRosa-Grund") and the failure of counsel to appear on behalf of the corporate defendants, a default was entered against defendants Projo Poker Tournament Series, LLC ("Projo"), Projo Poker Tournament Services, LLC, and Projo Poker Tournament Servies, LLC. Plaintiffs moved for summary judgment on December 12, 2006, against DeRosa-Grund, the sole remaining defendant. On June 26, 2007, plaintiffs' motion was denied without prejudice to its renewal after additional discovery (the "June 2007 Opinion"). PSG Poker, LLC v. DeRosa-Grund, No. 06 Civ. 1104, 2007 WL 1837135 (S.D.N.Y. June 26, 2007). Plaintiffs have now filed their renewed motion. As in their previous motion, plaintiffs seek to pierce the corporate veil and hold DeRosa-Grund personally liable on the breach of contract claim. DeRosa-Grund has not filed opposition to the motion. For the reasons stated below, the plaintiffs' renewed motion for summary judgment is granted.

BACKGROUND

I.   Discovery and Litigation

As described in greater detail in the June 2007 Opinion, prior to the filing of the initial summary judgment motion DeRosa-Grund had failed to appear at his scheduled deposition or to produce more than a few documents in response to plaintiffs' discovery requests. As the Court noted in the June 2007

Opinion, DeRosa-Grund's failure to comply with his discovery obligations made it "difficult for plaintiffs to acquire and present" the facts necessary to support their motion. Thus, the initial motion was denied without prejudice, and DeRosa-Grund was "fully informed of the consequences of his noncompliance" -- namely, the drawing of an adverse inference on the topics regarding which discovery was sought -- and given "one final opportunity to comply with his discovery obligations." PSG Poker, LLC, 2007 WL 1837135, at *6.

A June 26, 2007, Order accompanying the decision on the initial motion directed DeRosa-Grund to produce documents by July 11, 2007, and further directed that his deposition would take place the week of July 16, 2007. Both parties were also directed to submit status letters to the Court by July 27, 2007.

DeRosa-Grund did not submit a status letter. Plaintiffs' status letter reported that DeRosa-Grund did not produce documents prior to July 11, 2007, but that after subsequent requests, DeRosa-Grund did produce some documents and appear for a deposition on July 26, 2007. DeRosa-Grund did not provide, however, any corporate records relevant to the veil piercing issue or documents regarding the termination of the contract with CBS to air the proposed poker program on that network. DeRosa-Grund stated at his deposition that he did not retain paper copies of documents -- including receipts, bank

3

statements, or other corporate records -- but rather scanned them onto a hard drive and shredded them. He further testified that the hard drive to which all his documents had been saved failed approximately eighteen months earlier, and that he had thus lost all of his documents. (He testified that he was able to recover the documents and emails that he did produce from a limited pool of backup files.) In light of these issues, plaintiffs requested an order granting leave for them to serve subpoenas directly upon the bank at which Projo had maintained an account, CBS Sports, and a colleague of DeRosa-Grund's identified during the deposition. An Order granting this request was issued on July 31, 2007, and documents received in response to those subpoenas have been submitted in support of the renewed motion for summary judgment.

The July 21, 2007, Order also directed DeRosa-Grund to produce any additional documents by August 17, 2007. Plaintiffs' motion papers indicate that a renewed request was made on August 2, 2007, for, inter alia, Projo's corporate records, documents related to the alleged loss of DeRosa-Grund's scanned documents,[1] and contracts and correspondence with CBS.

---

[1] DeRosa-Grund stated at the deposition that the hard drive failed as a result of an electrical problem, and that he had filed a complaint with the Pennsylvania Public Utilities Commission in connection with that event. Plaintiffs requested a copy of that complaint, but have not received one.

DeRosa-Grund did not produce documents in response to this request.

## II.  Factual Background

### A.  DeRosa-Grund's Initial Dealings with CBS and Gordon

The following facts are undisputed or are taken in the light most favorable to DeRosa-Grund, unless otherwise noted. Projo Poker Tournament Series, LLC[2] was incorporated in Delaware on August 18, 2005, and operated out of the Pennsylvania address where DeRosa-Grund resides.  According to a press release issued by CBS Sports, "ProJo Poker Enterprises" reached an initial agreement with CBS Sports in July of 2005 to produce and televise "the ProJo Poker tournament series" and several related specials, including "The ProJo Christmas Poker Classic" (collectively, the "ProJo Programs").  As the press release describes, "[t]he series utilizes ProJo Poker's proprietary tournament format" in which poker "Pros" and "average Joes" compete against one another in a series of competitions.[3]

---

[2] As noted above, this entity will be referred to as "Projo." The issue of the appropriate name of the corporation, as well as DeRosa-Grund's use of that (and other) names for it, will be discussed below.

[3] This press release is referred to in the email sent by DeRosa-Grund to Gordon and Howard Lederer on November 1, 2005 (submitted in support of plaintiffs' initial motion for summary judgment).  As noted in the email, it is available at http://cbs.sportsline.com/info/ir/press/2005/projopoker05.

In response to the subpoena issued following the July 31, 2007 Order, CBS Sports produced a copy of an agreement between it and "PROJO POKER ENTERPRISES, LLC" regarding the ProJo Poker Tournament Series (the "CBS Agreement"). The CBS Agreement is dated August 15, 2005, and was signed by DeRosa-Grund on behalf of ProJo Poker Enterprises, LLC on October 12, 2005.[4] Section III(b) of the Agreement provides that the ProJo poker programming will be produced by ProJo Poker Enterprises, but that CBS will be responsible for providing a "Coordinating Producer and On-Air Talent." Section IV(a) of the Agreement states that ProJo Poker Enterprises will pay $1,325,000 in "Program Fees" in exchange for CBS making available certain program time periods for the airing of the ProJo specials, and $2,700,000 for the program time periods for airing the "tournament series" programs. That section further provides that the $1,325,000 fee for the specials "will be paid to CBS no later than the first of October 2005." Section IV(b) states that, in turn, ProJo Poker Enterprises will have the right to sell twenty thirty-second commercial spots during each hour of broadcasting and to retain all revenue thereby obtained. Finally, Section V(m) of the Agreement states that if any breach of the Agreement is not cured "within fourteen (14) days after

---

[4] DeRosa-Grund stated at his deposition that he recognized that the wrong corporation name had been used in the contract, but that he and CBS had decided not to correct it at that time.

receipt of written notice from the other party, the non-breaching party shall have the right to terminate this Agreement."

Prior to the beginning of his relationship with DeRosa-Grund, Gordon was the co-host and commentator for the program "Celebrity Poker Showdown" ("CPS") on the cable television station Bravo. The parties have disputed whether DeRosa-Grund or CBS first approached Gordon to act as on-air host for the ProJo Programs, but, in any event, emails submitted in connection with the initial motion for summary judgment demonstrate that as of September 30, 2005, DeRosa-Grund and Gordon were negotiating via email the terms of an agreement whereby Projo would pay Gordon $10,000 per episode to host the ProJo Tournament Series in addition to a fee that CBS would pay directly to Gordon. Gordon avers that in his discussions with DeRosa-Grund, the defendant "represented to me that the Projo Program would be shown on a major broadcast television network, including several prime time special presentations, and that I would receive compensation far greater than I was then making for the CPS show."

In one of the September 30, 2005, emails, DeRosa-Grund states that "CBS will land somewhere between $8-10K per show" in compensation, and that "I'll give you 10k per show for syndicated and an additional $10k to whatever CBS pays." Gordon

responded to this email by writing that while he felt that his "analysis and hosting is worth significantly more," he was "worn down from the back and forth," and that he "need[ed] all remainin[g] available time to work with [B]ravo and help you with planning, scripts, etc." Gordon further wrote that he needed a signed letter reflecting their agreement, and that once he had one he would "move immediately toward getting out of my [Bravo] contract."[5] The agreement between Gordon and Projo is memorialized in an unexecuted draft letter attached to an email sent by DeRosa-Grund to Gordon via email on October 4, 2005, and reflects the terms discussed in the emails of September 30. Gordon avers that, in light of Gordon's CPS contract with Bravo, DeRosa-Grund would not execute a formal agreement until "any doubt as to [Gordon's] availability for the Projo Programs [was] removed."

Around the time of DeRosa-Grund's negotiations with Gordon, DeRosa-Grund, on behalf of "ProJo Poker Enterprises, LLC," also entered into an agreement with Interskills Games Limited ("Interskills"), dated and signed September 22, 2005, for Interskills to advertise on the various ProJo Programs (the "Interskills Agreement"). The Interskills Agreement provides

_____

[5] As discussed further below, the majority of these emails were sent to and from an email account maintained by DeRosa-Grund at "multimodalmedia.com" and contained a signature block stating, "Tony DeRosa-Grund, CEO, MultiModal Media Group/Meridian Pictures."

that, in exchange for airing advertisements on each of the various ProJo Programs, Interskills would pay "ProJo Poker Enterprises" $50,000 upon execution of the Agreement, place $2,258,579 in escrow in the United Kingdom, and then authorize release of a certain amount of funds (between $100,000 and more than $200,000) each time Interskills received confirmation that its advertisements had aired in connection with a ProJo Program. The Interskills Agreement also provides that Interskills would release $118,390 from escrow upon receiving confirmation from CBS that the first ProJo Program would air as scheduled on December 25, 2005.  Finally, the Interskills Agreement states that "it shall be a condition of this Agreement that the [advertisements] be aired on CBS Network and not any other network."  DeRosa-Grund testified at his deposition that Projo ultimately received approximately $200,000 under this contract, and the bank records obtained by the plaintiffs reveal that the Projo account received a $50,000 wire transfer from an entity called Paytech International Limited on September 23, 2005 (the day after the execution of the Interskills Agreement), and a second transfer of $140,000 from that same source on November 30, 2005.[6]

---

[6] While the $50,000 payment on September 23, 2005, neatly corresponds to Interskills' obligation to make a $50,000 execution payment following execution the Interskills Agreement on September 22, 2005, it is not immediately clear from the

B.    The Termination of the CBS Agreement

Shortly after the September 2005 agreements with Gordon and Interskills, Projo defaulted on its obligations under the CBS Agreement.  As noted above, the initial $1,325,000 payment under the CBS Agreement was due on October 1, 2005.  According to DeRosa-Grund's deposition testimony, however, on or before that date he had determined not to make that payment in light of an announcement made in September 2005 by the cable network Spike TV (an entity affiliated with CBS) stating that Spike TV would be airing shows using a "Pros vs. Joes" format similar to that contemplated in the CBS Agreement.[7]  DeRosa-Grund testified at

_____

terms of the Interskills Agreement what would have triggered the $140,000 payment, and DeRosa-Grund's deposition testimony does not elucidate that issue.  In any event, however, it may be noted that according to the monthly account statements, these two deposits, totaling $190,000, are the only substantial deposits that were ever made into the Projo bank account, other than a $43,000 deposit made on August 25, 2005, whose source is not apparent from the record.

[7] In June 2006, DeRosa-Grund -- along with "Keystone Productions-QMA, Inc, d/b/a/ Multimodal Media Group and Meridian Pictures" -- filed a complaint in New York State Supreme Court regarding the alleged appropriation of this concept.  A copy of that complaint has been submitted in connection with the instant motion.  The complaint alleges that it was the plaintiffs in that matter -- i.e., DeRosa-Grund and the entities just listed -- that negotiated and entered into an agreement with CBS to air the ProJo Programs.  Projo Poker Tournament Series, LLC, the entity referred to as "Projo" here, is not mentioned in that complaint.  DeRosa-Grund reported at his deposition that the June 2006 litigation was eventually settled.  When asked at the deposition into which bank account the funds received in the settlement were deposited, DeRosa-Grund replied, "Could have been personal.  Could have been ProJo.  Could have been both.  Again, I don't recall."

his deposition that, as of September/October of 2005, he was simply withholding payment on the CBS Agreement while he was "trying to work it out with them."

Emails -- produced by CBS -- between DeRosa-Grund and CBS employees following Projo's failure to make the October 1, 2005, payment provide a different account. On October 11, 2005, Robert Correa ("Correa") of CBS wrote to DeRosa-Grund regarding the late payment, stating that "[w]e still have not received the payment . . . now 11 days late. . . . Our collection guys are nervous and are bugging me for a drop dead when we cancel the deal." DeRosa-Grund responded that day, stating that he was in London and that "it [i.e., the payment check] was sent to a CBS office in Chicago." The next day, DeRosa-Grund sent a follow-up email, which states that,

> The payment was sent to your Chicago office via 'Surface Mail' through the 'Royal Mail.' Apparently they[8] did not understand it was time of the essence and they were looking at the most economical means of

---

[8] It is not apparent from this email who "they" refers to specifically, as plaintiffs did not possess these emails prior to DeRosa-Grund's deposition, and were thus unable to ask him to explain. It can be inferred, however, from DeRosa-Grund's repeated references during his deposition to the $2.25 million placed in escrow in London by Interskills under the Interskills Agreement, and DeRosa-Grund's assertion to CBS that the check was being sent from London, that DeRosa-Grund had told CBS that the October 1, 2005, payment would be made with Interskills' escrow funds. (This also comports with later statements made by DeRosa-Grund to Gordon.) As will be discussed further below, however, it is clear from the terms of the Interskills Agreement that Projo was not entitled to a $1.3 million payout as of October 1, 2005.

sending it.  I was told by our local post office that
what little they know about 'Surface Mail' from the
Royal Mail it takes about two weeks to two and a half
weeks from the UK to reach a destination in the US,
normally, but they have seen it take anywhere up to
three.  I think the end of this week is two and the
end of next week would be three weeks.

Correa responded pointedly, "I have never heard of such a thing."

On or before October 19, 2005, Correa sent an email to DeRosa-Grund stating, "Still no check . . . deal is off next week if we don't receive the money."  DeRosa-Grund replied on October 19 and offered that, "if you don't get the check by Royal Mail by Friday we'll stop payment on it and re-issue you a new payment upon confirmation the check wasn't negotiated."  He further added that "you can't just say the deal is 'off'" in light of Section V(m) of the CBS Agreement, which provides for a fourteen-day cure period following written notification of a material breach.  DeRosa-Grund concluded, however, that "I'm sure it won't come to that . . . . Have you checked with Chicago to see if they have received a payment for $1,300,000US and possibly not applied it or applied it to the wrong account?"

By a letter dated October 24, 2005, CBS Sports provided the written notice of breach called for under Section V(m), and stated that the CBS Agreement would be terminated effective November 7, 2005, if the $1.3 million payment was not made by that time.  A letter from CBS dated November 9, 2005, recounts

that DeRosa-Grund acknowledged receipt of the notice on October 28, 2008, and that the cure period would be extended to November 11, 2005.[9] A letter of November 14, 2005, from CBS to DeRosa-Grund confirmed that, in light of the failure to make the initial $1.3 million payment, "CBS has exercised its right to and terminated the Agreement for material breach effective at 11:59 p.m. November 11, 2005."

Notably, at no time during the correspondence with CBS did DeRosa-Grund state that he had chosen not to make the October 1, 2005, payment because of actions taken by Spike TV. Similarly, despite DeRosa-Grund's representations to CBS that a check was coming in the "Royal Mail," DeRosa-Grund acknowledged during his deposition that the $1.3 million payment was never made. Finally, the bank records obtained by the plaintiff reveal that the Projo bank account never contained sufficient funds to make such a payment.

## C. DeRosa-Grund's Subsequent Dealings with Gordon

It is not disputed that, as the deal with CBS fell apart between October 1 and November 14, 2005, DeRosa-Grund did not inform Gordon of that development. Rather, DeRosa-Grund

---

[9] The letter states that while a DHL courier was not able to deliver a package to "Projo Poker Enterprises" at the address provided, a delivery to "MultiModal Media Group/Meridian Pictures" on October 28, 2005, was accepted at the same address. DeRosa-Grund then acknowledged receipt on behalf of Projo.

continued to report that the deal with CBS remained in place.
For example, in an email dated November 1, 2005 -- four days
after DeRosa-Grund acknowledged receipt of the notice from CBS
that the CBS Agreement would soon be terminated -- DeRosa-Grund
reported to Gordon and another poker professional that "[i]n
addition to the 26 anticipated ProJo tournament events we have
CBS committed to air four ProJo poker two hour specials."

Gordon avers that, in reliance on these and other
representations made by DeRosa-Grund about the status of the CBS
Agreement, he commenced litigation against the producers of CPS
to make himself available for the ProJo Programs and quit his
job with CPS and Bravo. Gordon filed an order to show cause to
that effect on October 31, 2005, and the docket for that matter
confirms that a settlement was reached on November 7, 2005. See
Gordon v. Picture This Television, LLC, No. 05 Civ. 9236
(S.D.N.Y.) (Docket Nos. 4 & 7). Gordon avers that this
settlement confirmed his availability to host the ProJo Programs
and ended his employment on the CPS program.

On November 9, 2005 -- two days after the completion of
Gordon's litigation to make himself available for the ProJo
Programs, two days prior to the formal termination date of the
CBS Agreement, and more than a week after DeRosa-Grund's receipt
of the notice of termination from CBS -- Gordon asked DeRosa-
Grund via email, "Is there even the slightest chance this thing

won't go through?" DeRosa-Grund replied, "I'm not worried we have $2.3MM in a UK escrow account – just working on getting the $1.5MM released to us to complete transaction."[10]

On November 23, 2005, Gordon contacted a producer at CBS Sports and discovered that DeRosa-Grund had defaulted on the CBS Agreement. Gordon then wrote to DeRosa-Grund, reported what he had discovered, and requested that DeRosa-Grund "just call me and tell me the complete straight truth about what is going on." DeRosa-Grund's response reads, in full:

> T[h]ere is a technical default and CBS while I was in the hospital was playing a 'Bait and swit[ch]' trying to move Christmas from 12/25 airing at a cost of $400 for 2 hours to 13/31 at 90 minut[e]s for $500,[000]!
>
> Bottomlin[e] []we will still go – in active discussions with UPN to move all Specials over to them for primetime airing. I try to have Mike Daraio our EVP sales and Administration talk to you. We'll still get on – please don't worry.
>
> BTW – Payment was in escrow at RBS in UK and Correa gave us a rash of non[]sense as to why he wouldn't w[a]it 7 days for the CBS monies to be released from escrow to him.
>
> In any even[t] I have been told to do no business the past three[] days per my heart – I'm actually

---

[10] It is not completely clear from the copy of this email exchange provided by the plaintiffs which emails sent by DeRosa-Grund and Gordon are responsive to which prior emails sent by the other party. In any event, however, the essence of the exchange is the same regardless of the order of statements and replies: Gordon is expressing concern, and DeRosa-Grund is making reassuring statements. It is also not apparent from either these emails or Gordon's affidavit if Gordon had any particular reason to be concerned about the status of the CBS Agreement as of November 9, 2005.

sneakin[g] [this] to you now as I have a 4 hour test
scheduled with the nuclear medicine people at 8A[M]
which will take 2-4 hours I'm told – after that they
will g[i]ve me [the] prognosis this after noon at
which time I'll contact you.

Thanks for your patience[.][11]

Gordon responded in a lengthy email on the evening of

November 23.  He began:

You say not to worry, but that is impossible at this
point.  UPN is not CBS.  I quit my job with Bravo and
spent $35,000 to do so to move to major network
television.  Had I known the shows were going on UPN,
I would not have left Bravo.  End of story. . . .

I feel like I have been misled.  I was told 'the air
time has been purchased' and we're doing 10 shows on
CBS and 16 on cable.  That is why I quit my job and
spent the money on the lawyers, Tony.

But, with CBS officially confirming that the series
will not be on their network, we have to move ahead
and figure out what to do next.

Gordon then calculated that he would have been paid a total

of $340,000 under the agreements with DeRosa-Grund and CBS, and

that "[t]his figure, and the fact that I'd be hosting a network

television show, is why I left my job."  Gordon then stated that

he was willing to sign a contract with DeRosa-Grund to be

_____

[11] Plaintiffs requested -- but did not receive -- documentation
confirming DeRosa-Grund's health problems during this period.
It may also be noted that, (1) the communications with CBS make
no mention of a "Bait and Switch" of the kind described by
DeRosa-Grund here; (2) DeRosa-Grund stated at his deposition
that he was the only employee of Projo, despite the reference
here to a sales and administration employee; and (3) DeRosa-
Grund also produced no documents confirming the "active
discussions with UPN."

available, on a non-exclusive basis, to host 26 episodes of a

poker series to be filmed in 2005 and 2006. As a condition of

signing such a contract, however, Gordon demanded a down payment

of $170,000 -- half of the total due to him under the

contemplated agreement -- "paid immediately." Gordon then

concluded:

> Tony, I put a great deal of faith in you -- do the
> right thing and make this easy for me to sleep at
> night. If you truly believe this show is going to
> happen, pay me now. Without the 50% downpayment, I am
> going to move on, eat crow and get my job back with
> Bravo, look for alternative broadcasting jobs in
> poker, and be forced to seek legal remedy.
>
> I am truly sorry that your health has taken a turn for
> the worse, and I really want you to know that I am
> here for you and will be 100% devoted to your project,
> as I have been since the first day we spoke on the
> phone. I have been nothing but completely and totally
> honest and forthright with you -- it is time for you
> to step up to the plate and show me that we are
> partners. Write the check, Tony. Nothing else will
> convince me that we should continue to do business.

A contract dated October 26, 2005, and signed by Gordon and

DeRosa-Grund on December 17 and 18, 2005, respectively, reflects

the terms offered by Gordon in his email of November 23 (the

"December 2005 Contract"). The Contract was signed on behalf of

PSG Poker by Gordon and on behalf of "PROJO POKER TOURNAMENT

SERVICES, LLC" by DeRosa-Grund. The Contract -- drafted by

DeRosa-Grund -- states that, "[i]t is currently anticipated that

the Series for PROJO POKER shall consist of twenty-six (26) one

hour shows" that "shall be distributed by PROJO for broadcast

. . . in any exploitation medium PROJO so chooses in their sole and unfettered discretion." In exchange for acting as the "on-camera poker analyst," Gordon would be paid a total fee of $340,000, $170,000 of which would be "payable within 15 business days of the execution of this agreement." The final section of the Contract provided for a fifteen-day cure period with respect to the initial payment, and a sixty-day cure period with respect to any other default.

As described in the June 2007 Opinion, Gordon provided several reminders prior to the time the initial $170,000 payment was due, but DeRosa-Grund did not make the payment. On January 4, 2006, DeRosa-Grund stated in an email to Gordon that "15 business days from execution is the 10th Phil, not the 4th. Hope you had a good holiday and talk to you on Monday." Gordon provided a notice of default on January 10, 2006, but DeRosa-Grund failed to cure within the fifteen-day period. In fact, Gordon avers that the January 4, 2006, email was DeRosa-Grund's last communication to him regarding either the December 2005 Contract or the ProJo Programs. This litigation followed.

DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to

a judgment as a matter of law."  Rule 56(c), Fed. R. Civ. P.
The moving party bears the burden of demonstrating the absence
of a material factual question, and in making this determination
the court must view all facts in the light most favorable to the
non-moving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.
242, 247 (1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323
(1986).  When the moving party has asserted facts showing that
the non-movant's claims or defenses cannot be sustained, the
opposing party must "set forth specific facts showing that there
is a genuine issue for trial," and cannot rest on the "mere
allegations or denials" of the movant's pleadings.  Rule 56(e),
Fed. R. Civ. P.; <u>accord</u> <u>Sista v. CDC Ixis N. Am., Inc.</u>, 445 F.3d
161, 169 (2d Cir. 2006).

As noted above, DeRosa-Grund was repeatedly warned in the
June 2007 Opinion that continued failure to comply with his
discovery obligations could give rise to the imposition of an
adverse inference against him regarding, <u>inter alia</u>, the
corporate structure of Projo and whether he made any knowingly
false statements to Gordon.  The legal standard that governs
whether an adverse inference may be properly drawn was reviewed
in the June 2007 Opinion, but may be briefly summarized as
follows.  Where a party has failed to produce requested
evidence, "a district court has broad discretion in fashioning
an appropriate sanction."  <u>Residential Funding Corp. v. Degeorge</u>

<u>Financial Corp.</u>, 306 F.3d 99, 107 (2d Cir. 2002).  In such situations,

> the party seeking the instruction must show (1) that
> the party having control over the evidence had an
> obligation to timely produce it; (2) that the party
> that failed to timely produce the evidence had "a
> culpable state of mind"; and (3) that the missing
> evidence is "relevant" to the party's claim or defense
> such that a reasonable trier of fact could find that
> it would support that claim or defense.

<u>Id.</u>


I.    Breach of Contract

Plaintiffs claim breach of contract based on defendants'
failure to make the initial $170,000 payment under the December
2005 Contract.  To succeed on a breach of contract claim under
New York law,[12] plaintiffs must demonstrate (1) the existence of
a contract, (2) adequate performance of the contract by the
plaintiffs, (3) breach of the contract by the defendants, and
(4) damages.  <u>24/7 Records, Inc. v. Sony Music Entm't, Inc.</u>, 429
F.3d 39, 42 (2d Cir. 2005).  The evidence in the record
demonstrates conclusively -- and, in fact, it is undisputed --
that the December 2005 Contract existed between the plaintiffs
and DeRosa-Grund/ProJo, that plaintiffs stood ready to perform
under that Contract, that the $170,000 execution payment was not

---

[12] As noted in the June 2007 Opinion, New York law should be
applied to the breach of contract claim.  <u>PSG Poker, LLC</u>, 2007
WL 1837135, at *3 n.6.

made, that such failure constituted a breach of the Contract, and that the breach caused damage to the plaintiffs.

The only defense raised by DeRosa-Grund at his deposition was that the December 2005 Contract was contingent on the Projo programs being aired on CBS, and that Gordon "knew" of this condition when the Contract was entered into. The terms of the December 2005 Contract, as well as the email negotiations leading up to the signing of that Contract, make plain, however, that there was no such condition on the Contract or the initial payment, and the Contract contains a merger clause disclaiming all prior understandings between the parties. Moreover, it must be noted that, contrary to DeRosa-Grund's testimony, the evidence in the record demonstrates that the December 2005 Contract was entered into precisely <u>because</u> both DeRosa-Grund and Gordon already understood that the CBS Agreement had been terminated and that the ProJo Programs would <u>not</u> air on CBS. Thus, no reasonable jury could conclude that the December 2005 Contract was not breached, and DeRosa-Grund has offered no admissible evidence to the contrary. Summary judgment is thus appropriate on this issue.

As in their previous motion, however, plaintiffs seek to hold DeRosa-Grund personally liable for the breach. As noted in the July 2006 Opinion, DeRosa-Grund did not assume personal liability in the December 2005 Contract, but rather signed on

behalf of "PROJO POKER TOURNAMENT SERVICES, LLC," and thus plaintiffs must pierce the corporate veil in order to hold DeRosa-Grund personally responsible.

A.    Piercing the Corporate Veil

Projo was incorporated in Delaware, and thus the question of whether DeRosa-Grund can be held personally liable for the beach of the December 2005 Contract is to be decided under Delaware law.  United States v. Funds Held in the Name or for the Benefit of Wetterer, 210 F.3d 96, 106 (2d Cir. 2000).  Due to the limited discovery plaintiffs had obtained at the time of their initial motion for summary judgment, plaintiffs' initial veil-piercing claim was supported only by the following facts: (1) that DeRosa-Grund was the sole shareholder, officer, and director of Projo, (2), that he supervised and controlled the acts of Projo complained of in this action, (3) that he was the only person who ever communicated with plaintiffs on behalf of Projo, and (4) that Projo conducted business out of DeRosa-Grund's residence.  The June 2007 Opinion concluded that these facts were insufficient, standing alone, to allow the Court to pierce the corporate veil under Delaware law as a matter of law. The motion was denied without prejudice to its renewal following additional discovery, and DeRosa-Grund was warned that an adverse inference may be drawn on the question of corporate

structure if he failed to comply fully with his discovery obligations.

Based on the evidence they have now obtained, plaintiffs renew their request that the corporate form of Projo be disregarded under an "alter ego" theory. "Delaware law permits a court to pierce the corporate veil of a company 'where there is fraud or where [it] is in fact a mere instrumentality or alter ego of its owner.'" Fletcher v. Atex, Inc., 68 F.3d 1451, 1457 (2d Cir. 1995) (quoting Geyer v. Ingersoll Publ'ns Co., 621 A.2d 784, 793 (Del. Ch. 1992)). "To prevail on an alter ego claim under Delaware law, a plaintiff must show (1) that the parent and the subsidiary [or the owner and the corporation] operated as a single economic entity and (2) that an overall element of injustice or unfairness is present." Id. (citation omitted).

1. "Single Economic Entity"

Factors relevant to the question of whether an owner and his corporation are "a single economic entity" include

> whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder.

Id. at 1458 (citation omitted).

Several of these factors weigh decisively in favor of a finding that Projo and DeRosa-Grund were a "single economic entity." First, as noted in the June 2007 Opinion, it is undisputed that Projo held no corporate meetings, employed no one other than DeRosa-Grund, had no other officers or directors, and operated out of DeRosa-Grund's home. It is now also apparent that Projo maintained no corporate records,[13] that the company never engaged the services of an accountant or attorney, and did not have utility or other bills in its own name.[14] DeRosa-Grund also stated at his deposition that he did not recall whether tax returns had ever been filed for the company, and he has not produced copies of tax filings.

Second, DeRosa-Grund consistently failed to observe a fairly basic "corporate formality" -- namely, holding himself out as doing business under the auspices of "ProJo Poker

---

[13] Although DeRosa-Grund claimed that he retained records electronically, which he then lost when his hard drive failed, he did not produce, when requested, any evidence to support that claim. In addition, he declined to provide records -- including bank statements -- that were requested and available to him from third-parties. Finally, in any event, his decision to shred all paper copies of his records and receipts could itself be deemed a failure adequately to maintain records.

[14] DeRosa-Grund stated that the utility bills were in the name of Keystone Productions -- another entity affiliated with DeRosa-Grund and included in the Spike TV complaint -- and that he did not see any reason to have those bills transferred to Projo.

Tournament Series, LLC," the name on record with the Delaware

Secretary of State. Rather, DeRosa-Grund entered into contracts

under several variants of that name; the CBS and Interskills

Agreements, for example, were signed by DeRosa-Grund on behalf

of "ProJo Poker Enterprises, LLC," and the December 2005

Contract with Gordon was signed by DeRosa-Grund on behalf of

"PROJO POKER TOURNAMENT SERVICES, LLC." Similarly, although the

evidence in the record indicates that DeRosa-Grund conducted his

business communications almost exclusively over email, the

majority of the email correspondence in the record here related

to the ProJo Programs was sent from an email account maintained

by DeRosa-Grund at "multimodalmedia.com" and contained a

signature block reading, "Tony DeRosa-Grund, CEO, MultiModal

Media Group/Meridian Pictures." Finally, in filing his action

against Spike TV in June 2006 regarding the "Pros vs. Joes"

television format, DeRosa-Grund stated that it was he, along

with "Keystone Productions-QMA, Inc, d/b/a/ Multimodal Media

Group and Meridian Pictures" -- and not Projo -- that negotiated

and entered into an agreement with CBS to air the ProJo

Programs.[15] In short, DeRosa-Grund consistently failed to

accurately represent that he was acting on behalf of Projo --

_____

[15] By contrast, DeRosa-Grund stated at his deposition that he was
not involved with or running any other businesses during the
events in question here.

and not himself or some other entity -- when conducting business or entering into contracts related to the ProJo Programs.

Third, and perhaps most strikingly, the bank records subpoenaed by the plaintiffs demonstrate conclusively that DeRosa-Grund siphoned the vast majority, if not all of the funds from the Projo bank account for his personal use. As noted above, the only significant deposits made to the Projo bank account were (1) the $190,000 that appears to have been wired to Projo pursuant to the Interskills Agreement, and (2) a $43,000 deposit made on August 25, 2005, whose source is not indicated in the record. Although the Projo account was closed in April 2006 with a negative balance, DeRosa-Grund was not able to articulate at his deposition how more than $200,000 could have been spent on Projo-related expenses in light of the fact that the ProJo Programs were never produced or aired. He stated at his deposition that Projo's funds had been spent on "phones, faxes, servers, travel," graphic design, "website design for the CBS stuff," and perhaps unspecified "consulting fees," but when questioned closely he could only surmise that perhaps a few thousand dollars had been spent on each of these categories of expenses.[16]  Moreover, he did not produce records or receipts

---

[16] For example, he testified that graphic design expenses were in the "10 to S15,000 range," the phone bill was between "1,000 and $1,500 a month," and servers for hosting the on-line poker games cost $5,000 to set-up and some unspecified fee for "premium

documenting that those expenses were in fact incurred (again, based on the unsupported claim that such records had been lost).[17]

Projo's bank records -- which were obtained by the plaintiffs -- make clear why DeRosa-Grund was unable to account for these expenses: DeRosa-Grund was siphoning off Projo's funds for his personal benefit. Nearly all of the checks drawn on the Projo account are made out to "CASH," and were then endorsed either by DeRosa-Grund himself[18] or his wife (who is not an employee of Projo). (Although DeRosa-Grund stated at his deposition that he conducted all of his business in cash, the fact remains that he has not offered any admissible evidence that Projo had legitimate business expenses which required the use of such cash.) Checks not made out to "CASH" or to DeRosa-Grund himself, in turn, were made out to entities whose connection to the business of producing poker television programming cannot be surmised, including, (1) The Mount Pocono

service." He also testified that he did not fly when traveling, and always drove, thus eliminating potential expenses such as business-class air fare.

[17] In addition, as noted above, DeRosa-Grund could not recall where the funds that were purportedly received as a result of settling the Spike TV matter were deposited. It may be noted, however, that the Projo bank account does not reflect a deposit that could correspond to the receipt of such funds.

[18] Plaintiffs note that some of the checks are made out to "Herbert Grund," which they allege is simply a shortened version of Herbert Anthony DeRosa-Grund -- either a pseudonym for the defendant here, or his full name.

School District, (2) Pediatrics of Northern Pennsylvania, (3) a

pet health center, and (4) Dave's Motorsports.  No reasonable

jury could conclude that these checks were issued as a result of

legitimate expenses incurred by Projo.[19]

In sum, no reasonable jury could conclude that Projo and

DeRosa-Grund were anything other than "a single economic

entity."  Fletcher, 68 F.3d at 1457 (citation omitted).  In

light of DeRosa-Grund's disregard for Projo's corporate

structure, it is beyond dispute that Projo "simply functioned as

a facade for" DeRosa-Grund's own activities, id. (citation

omitted), albeit one that even DeRosa-Grund made use of

haphazardly.  Summary judgment is therefore appropriate as to

this element of the alter-ego analysis.


2.    "Overall Element of Injustice or Unfairness"

Under the second prong of the alter ego analysis, while a

showing of fraud is not necessarily required, id., Delaware

courts have stated that, "[p]iercing the corporate veil under

the alter ego theory requires that the corporate structure cause

fraud or similar injustice.  Effectively, the corporation must

_____

[19] Plaintiffs also state that several large cash withdrawals and
debt memos were issued to Verizon and Nextel on behalf of QMA
Advertising, one of the corporate entities mentioned in the
Spike TV complaint.  Although the account statements submitted
in support of the renewed motion show the issuance of such debt
memos, the destination of the funds is not apparent from those
documents.

be a sham and exist for no other purpose than as a vehicle for fraud." Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood, 752 A.2d 1175, 1184 (Del. Ch. 1999) (citation omitted); see also Mason v. Network of Wilmington, Inc., No. Civ. A. 19424-NC, 2005 WL 1653954, at *3 (Del. Ch. July 1, 2005). Put differently, while "[f]raud is frequently cited as a basis on which to pierce the corporate veil . . . it is not the only one: It may be done only in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where equitable considerations are involved." Mobil Oil Corp. v. Linear Films, Inc., 718 F. Supp. 260, 268 (D. Del. 1989) (citation omitted); see also NetJets Aviation, Inc. v. LHC Commc'ns LLC, No. 02 Civ. 7441, 2006 WL 1627899, at *6 (S.D.N.Y. June 12, 2006) (citing cases). Finally, it has been recognized that the fraud, injustice, or unfairness supporting a claim under this prong of the alter ego analysis must be distinct from the allegations of the underlying cause of action. Mobil Oil Corp., 718 F. Supp. at 268; see also SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Props., LLC, 375 F. Supp. 2d 238, 244 (S.D.N.Y. 2005).[20]

---

[20] As the court reasoned in Mobil Oil Corp., "The underlying cause of action does not supply the necessary fraud or injustice. To hold otherwise would render the fraud or injustice element meaningless, and would sanction bootstrapping." 718 F. Supp. at 268.

Although the standard to be met is high (and, it should be recognized, less than clear[21]), summary judgment is also appropriate in favor of the plaintiffs on this second prong of the alter-ego analysis. Comparison with prior cases addressing this issue in this Circuit is instructive. In Fletcher, for example, in which summary judgment was entered for the defendants on the alter-ego issue, the Court of Appeals noted that, under the second prong of the analysis, "[t]here is no indication that [the defendant parent corporation] sought to defraud creditors and consumers or to siphon funds from its subsidiary," Fletcher, 68 F.3d at 1461. In reaching the same result in NetJets Aviation, the court noted that the plaintiffs had not "proven as a matter of law that [the individual defendant] conducted a sophisticated shell game to the purposeful detriment of creditors," 2006 WL 1627899, at *6, or shown that the defendant "formed [the corporation] with the specific fraudulent intent of evading liability to Plaintiffs" or "avoiding an adverse judgment." Id. (citing Mobil Oil Corp., 718 F. Supp. at 269).

---

[21] As Vice Chancellor Strine has recently noted, "legal doctrine in [the area of veil piercing] is rightfully criticized for its ambiguity and randomness. As distinguished scholars have noted, the tests used to determine whether a corporate veil should be pierced, or an entity should be considered a 'mere alter ego,' yield few predictable results." Allied Capital Corp. v. GC-Sun Holdings, L.P., 910 A.2d 1020, 1042-43 (Del. Ch. 2006).

First, unlike in the cases just cited, here there is ample evidence in the record that DeRosa-Grund siphoned the funds received by Projo for his personal benefit.[22]  Similarly, putting aside Gordon's own allegations for the purposes of this inquiry, there is extensive evidence in the record that DeRosa-Grund -- through the variously titled Projo-like entities -- sought to mislead and defraud both Interskills (who provided $190,000 to "ProJo Poker Enterprises, LLC" that it was never refunded under the terms of the Interskills Agreement[23]), and CBS (who, the emails above demonstrate, DeRosa-Grund repeatedly mislead with false promises that the required initial payment under the CBS Agreement was in the "Royal Mail").  In light of these facts, as well as the other evidence in the record reviewed above, a

---

[22] Although this factor was also considered under the first prong, <u>Fletcher</u> indicates that it may be relevant under the second prong as well.  68 F.3d at 1461.  This makes sense when one considers that the siphoning of funds indicates not only that a corporation and its owner are operating as a unified economic entity, but also that the corporate form has been erected for a fraudulent purpose -- <u>i.e.</u>, to solicit funds from investors and business partners purportedly on behalf of a corporation when, in fact, such funds are to be used for the owner's personal benefit.

[23] Section 2.2 of the Interskills Agreement provides that, <u>inter alia</u>, the $50,000 initial payment would be refunded in full if the Christmas Special did not air.  DeRosa-Grund stated at his deposition that although Interskills commenced litigation against him (or possibly Projo), Interskills settled for the release of the escrow funds, and did not receive their $190,000 back despite the fact that the ProJo Programs never aired.  DeRosa-Grund testified that Interskills, in essence, simply gave up attempting to recover the other funds.

reasonable jury would be forced to conclude that Projo was simply a "vehicle for fraud." <u>Wallace</u>, 752 A.2d at 1184.

Second, to the extent that plaintiffs' evidentiary offerings fall short of demonstrating that DeRosa-Grund, in choosing to adopt and use the corporate form, harbored a "specific intent to escape liability for a specific tort or class of torts," defraud creditors, or otherwise abuse the corporate form, <u>Mobil Oil Corp.</u>, 718 F. Supp. at 269 (citing cases), an adverse inference on this point is appropriate. DeRosa-Grund was warned in the June 2007 Opinion that "if [he] continues to refuse to comply with his discovery obligations, adverse inferences will be applied against him on the issue of corporate structure." Although -- belatedly -- DeRosa-Grund did appear for his deposition and produce some documents, he did not and has never produced any requested documents relevant to the issue of corporate form, including bank statements, records, bills, tax returns, receipts, documents demonstrating the formation of Projo, and the like, after either this Court's Orders of June 26, 2007 or July 31, 2007, or requests from the plaintiffs before, during, and after his deposition. To the extent that DeRosa-Grund has sought to explain the absence of certain of these documents by claiming that they were destroyed, he has likewise failed to produce any evidence -- again, despite requests at and after his deposition -- to document that

occurrence, including any documents related to the utility commission complaint DeRosa-Grund reports that he filed as a result of this event. His unsubstantiated assertion that the documents were "lost" is insufficient at this stage.

Under these circumstances, it must be concluded that despite the fact that DeRosa-Grund had "an obligation to timely produce" documents relevant to the corporate structure of Projo, DeRosa-Grund "failed to timely produce" those documents. Residential Funding Corp., 306 F.3d at 107. As to DeRosa-Grund's state of mind in failing to produce the documents, the Court of Appeals has stated that "it makes little sense to confine promotion of [the adverse inference's] remedial purpose to cases involving only outrageous culpability, where the party victimized by the spoliation is prejudiced irrespective of whether the spoliator acted with intent or gross negligence." Reilly v. Natwest Markets Group Inc., 181 F.3d 253, 267-68 (2d Cir. 1999). In this case, DeRosa-Grund's repeated failure to either produce relevant documents or a credible story regarding their whereabouts -- despite the admonitions of this Court and repeated requests from the plaintiffs -- can only be interpreted as an intentional and willful act. Finally, concerning the relevance of the evidence sought by the plaintiffs, the evidence in the record is such that "a reasonable trier of fact could infer that the destroyed [or unavailable] evidence would have

been of the nature alleged by the party affected by its
destruction." Residential Funding Corp., 306 F.3d at 109
(citation omitted) (alteration in original). "[A] showing of
gross negligence in the destruction or untimely production of
evidence will in some circumstances suffice, standing alone, to
support a finding that the evidence was unfavorable to the
grossly negligent party." Id. DeRosa-Grund's repeated and
purposeful evasion of discovery requests and Orders of this
Court -- along with the nature of the evidence obtained by the
plaintiffs from third-parties -- gives rise to an inference that
the evidence sought regarding Projo would be unfavorable to him,
in satisfaction of the relevance prong.

A district court has "leeway to tailor sanctions to insure
that spoliators do not benefit from their wrongdoing -- a
remedial purpose that is best adjusted according to the facts
and evidentiary posture of each case." Reilly, 181 F.3d at 267.
DeRosa-Grund was reminded of his discovery obligations, given a
"final opportunity" to meet them, and warned of the consequences
of his failure to do so -- yet he did not heed that warning.
Because equity requires that "the risk that the evidence would
have been detrimental rather than favorable should fall on the
party responsible for its loss" or absence, Residential Funding
Corp., 306 F.3d at 108 (citation omitted), an adverse inference
with regard to the corporate structure of Projo -- including

DeRosa-Grund's relationship with Projo and his intent in forming the company -- is appropriate.

In light of this adverse inference, as well as the well-documented abuse and disregard of the corporate form evident from the record, it must be found that no reasonable trier of fact could conclude anything other than that Projo was "a mere instrumentality or alter ego of its owner." Fletcher, 68 F.3d at 1457 (citation omitted). Summary judgment is therefore appropriate on this issue, and DeRosa-Grund may be held personally liable for the breach of the December 2005 Contract with plaintiffs.

II.  Fraudulent Misrepresentation

As discussed in the June 2007 Opinion, plaintiffs' second claim is properly characterized as alleging fraudulent inducement.  Under New York law, a plaintiff making such a claim

> must show by clear and convincing evidence that the
> defendant knowingly or recklessly misrepresented a
> material fact, intending to induce the plaintiff's
> reliance, and that the plaintiff relied on the
> misrepresentation and suffered damages as a result.

Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc., 500 F.3d 171, 181 (2d Cir. 2007).  Such a claim may be based upon an omission rather than an affirmative misrepresentation, but, in such a case, the plaintiff must also prove that the defendant "had a duty to disclose the concealed fact." Id.  Finally, any

reliance must have been "reasonable." Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V., 68 F.3d 1478, 1484 (2d Cir. 1995). In assessing whether reliance is reasonable, the entire context of the transaction is considered "including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." Emergent Capital Inv. Mgmt. LLC v. Stonepath Group, Inc., 343 F.3d 189, 195 (2d Cir. 2003).

Even putting aside DeRosa-Grund's failure to inform Gordon during October and early November of 2005 about his default on and the impending termination of the CBS Agreement -- and thus the issue of whether DeRosa-Grund had a duty to reveal that information to Gordon -- the evidence in the record regarding DeRosa-Grund's affirmative misrepresentations is such that no reasonable jury could conclude that DeRosa-Grund did not fraudulently induce Gordon to, inter alia, commence and pay for litigation to make himself available to host the ProJo poker programs; leave his job with CPS and Bravo; and -- perhaps most importantly -- put aside any opportunity he may have had to reverse the damage caused by those acts. Thus, summary judgment is also appropriate on this claim.

The evidence submitted in support of the renewed motion demonstrates that DeRosa-Grund made at least three affirmative misrepresentations of material facts. First, on November 1,

2005 -- long after DeRosa-Grund had defaulted on the CBS
Agreement, four days after CBS sent its notification of intent
to terminate the CBS Agreement, but before Gordon's litigation
with the producers of CPS had been completed -- DeRosa-Grund
stated to Gordon in an email that "we have CBS committed to air
four ProJo poker two hour specials."  In light of the pending
termination, of which DeRosa-Grund was fully aware, this
statement was, at best, a reckless misrepresentation of a
material fact.  Second, on November 9, 2005 -- two days after
the settlement of Gordon's CPS litigation and two days prior to
the formal termination of the CBS Agreement -- Gordon asked
DeRosa-Grund if there was "even the slightest chance that this
thing won't go?", to which DeRosa-Grund responded, "I'm not
worried we have $2.3MM in a UK escrow account - just working on
getting the $1.5MM released to us to complete transaction."
This reassuring statement was known by DeRosa-Grund to be false
or highly misleading.  Although $2.3 million had been placed in
escrow in London, the Interskills Agreement demonstrates that
DeRosa-Grund had access to no more than a few hundred thousand
dollars of that money at that time, and there was absolutely no
basis upon which he would be able to secure the release of
"$1.5MM" prior to the termination of the CBS Agreement.  Third,
in the lengthy email exchange between DeRosa-Grund and Gordon on
November 23, 2005 -- after Gordon discovered that the CBS

Agreement had been terminated -- DeRosa-Grund misrepresented the status of the then-terminated CBS Agreement and the reason for the default (e.g., the "technical default," the supposed "Bait and swit[ch]," and Correa's "non[]sense" about waiting for the initial payment), as well as the status of the ProJo Programs (e.g., "[we] will still go,"; the claim that he was "in active discussion with UPN,"; and the purported efforts of his "EVP [of] sales and Administration").[24]  In light of the evidence reviewed above, including the communications with CBS and DeRosa-Grund's own deposition testimony, it must be concluded that these statements were known to be false by DeRosa-Grund when they were made.

That these statements were made with the intent of inducing Gordon to continue to do business with DeRosa-Grund is manifest from the context in which they were made, as well as their content.  Each of these statements -- and particularly the November 9 and November 23, 2005, statements -- were made specifically in response to queries from Gordon that indicated Gordon's concerns about the status of the ProJo Programs, and contained statements by DeRosa-Grund plainly calculated to have a reassuring effect.

---

[24] DeRosa-Grund also failed to produce evidence to the plaintiffs documenting his health status as of that time.

The evidence also demonstrates that Gordon's reliance was reasonable given "the entire context of the transaction." Emergent Capital Inv. Mgmt., 343 F.3d at 195. Unlike the parties in Emergent Capital and Merrill Lynch, this is not a case in which large corporations or investment banks were making representations to one another in the course of negotiating multimillion dollar transactions; Gordon -- who apparently acted without the benefit of representation during his negotiations with DeRosa-Grund[25] -- cannot be considered a "sophisticated business[man]" whose claims of reliance would be skeptically treated by a court applying New York law because of his access to critical information. Merrill Lynch, 500 F.3d at 181 (citing Grumman Allied Indus., Inc. v. Rohr Indus., Inc., 748 F.2d 729, 737 (2d Cir. 1984)). At least with respect to DeRosa-Grund's representations about the status of the escrow funds, CBS's negotiating tactics, and DeRosa-Grund's efforts to secure an alternative forum for the ProJo Programs, it may be said that such matters were "peculiarly within [DeRosa-Grund's] knowledge," and, thus, Gordon was entitled to rely upon those representations "without further investigation." Id. (A similar conclusion cannot be reached with respect to the

---

[25] Gordon's email of September 30, 2005, to DeRosa-Grund indicates that Gordon felt that he did not have time to involve his agent. In addition, none of the emails between the two indicate that Gordon was represented by an agent, or that either DeRosa-Grund or Gordon had retained an attorney.

misrepresentations regarding the status of the CBS Agreement; as Gordon's email of November 23, 2005, demonstrates, Gordon was always able simply to call CBS and inquire as to the status of the Agreement, which he ultimately did.)  Finally, nothing in any of the existing agreements between DeRosa-Grund and Gordon undermines the reasonableness of his claimed reliance.

Finally, it must also be concluded that Gordon was damaged as a result of DeRosa-Grund's misrepresentations.  As his November 23, 2005, email reveals, Gordon quit his job with CPS, initiated litigation with the producers of that program (further damaging his business relationships), and declined to undertake a timely effort to undo that damage as a result of the knowingly false representations made by DeRosa-Grund.  Although the precise amount of damage suffered will not be determined at this stage, no reasonable jury could conclude that the plaintiffs did not suffer damage sufficient to sustain a fraudulent inducement claim.

In short, no reasonable jury could find in favor of DeRosa-Grund on this claim, and DeRosa-Grund has not offered any evidence -- nor is such evidence present in the record -- indicating that material facts are in dispute.  Summary judgment on the fraudulent inducement claim is therefore appropriate.

CONCLUSION

Plaintiffs' renewed motion for summary judgment of

September 28, 2007, is granted. The matter will be referred to

the Magistrate Judge for an inquest as to damages.

SO ORDERED:

Dated:    New York, New York
          January 22, 2008

                              _____
                                      DENISE COTE
                              United States District Judge

COPIES MAILED TO:

Jonathan J. Ross
Caplan & Ross, L.L.P.
100 Park Avenue, 18th Floor
New York, NY, 10017

Tony DeRosa-Grund
600 Pocono Blvd.
Mt. Pocono, PA 18344